SOMMER ET AL., BD. OF PARK COMMRS., APPELLEES, *v.*
GENERAL INS. CO. OF AMERICA, APPELLANT.

[Cite as Sommer v. Genl. Ins. Co. (1970),
22 Ohio App. 2d 149.]

(No. 4910—Decided May 26, 1970.)

*Messrs. Manchester, Bennett, Powers & Ullman,* for appellees.

*Messrs. Pfau, Comstock & Springer,* for appellant.

JOHNSON, J. This is an action on a fidelity insurance policy by the members of and the Board of Park Commissioners of Mill Creek Park against defendant, General Insurance Company of America. Plaintiffs' action is bottomed on a claim that William Carroll, employed by plaintiffs as its golf professional, embezzled proceeds from the golf shop.

A third-party petition was filed by the defendant insurance company against William Carroll. Upon motion of the plaintiffs a separate trial was ordered on the third-party petition.

Upon trial on the plaintiffs' petition and the defendant's answer, the jury rendered a verdict in the full amount of the policy, ten thousand dollars.

This is an appeal on questions of law from the judgment, after denial of motions for a new trial and judgment notwithstanding the verdict.

The insurance policy contained the following provision under "General Agreements, Section B. Limitations of Coverage":

"This policy does not apply: * * * to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money, securities or other property which the insured can prove, through evidence wholly apart from such computations, is sustained by the insured through any fraudulent or dishonest act or acts committed by any one or more of the employees."

Three major errors are assigned by appellant, defendant below:

"1. The court erred in his ruling upon the evidence in admitting into evidence inventory computations as bearing upon both the factual existence of a loss and the amount of the loss.

"2. The court erred in instructing the jury in response to a question that it might consider inventory shortages in arriving at its verdict.

"3. The court erred in failing to grant final judgment to the defendant."

We will consider these assignments of error collectively.

In April 1963, William Carroll was employed by the plaintiffs as the golf professional at Mill Creek Golf Course. He was to receive a salary of $400 per month and a 20 per cent commission on the profits from the sale of merchandise and on the rental of golf carts.

Golf merchandise was purchased on order of Carroll, and invoices were paid by Mill Creek Park, and its cost inventory account was charged with these purchases.

A daily record of sales was kept, and at the end of each month the cost of the merchandise sold was given by Carroll to Mill Creek Park's bookkeeper, and she reduced the cost inventory accordingly.

In December of each year Carroll was required to take a physical inventory of the merchandise on hand, which he would cost out and give to the bookkeeper who would check it against Mill Creek Park's own cost inventory account.

At the end of 1963 and 1964 this procedure was followed, and, though there was some discrepancy, Mr Carroll's inventory figures were accepted and the bookkeeper adjusted the cost inventory accordingly.

In early January 1967, Carroll brought to the park offices what purported to be his year-end physical inventory for 1966. The figure was some $6,000 less than the cost inventory shown on the Park's books. When advised of this fact Carroll stated he had probably left an inventory sheet at the pro shop. The next day he reported figures to the bookkeeper, which substantially concurred with her totals.

In late January 1967, the Park Superintendent arranged to have his assistant and Mr. Carroll jointly take a physical inventory of the merchandise on hand at the pro shop. It was established that the actual physical inventory

was in excess of $10,000 less than the Park's cost inventory account.

Upon trial Mr. Carroll testified on cross-examination as to the inventories of 1965 and 1966, in part, as follows:

"Q. And she said in 1965 when she told you you were about $2,000 off, you said, well, I must have forgotten a paper: I'm going back to the pro-shop and see where it is?

"A. Right.

"Q. And you came back with another paper saying I overlooked some merchandise; this is the $2,000?

"A. I called her on the phone from the pro-shop and told her and gave her a figure and she said fine.

"Q. All right. What did you tell her?

"A. That I found another piece of paper with this total on it and she said fine.

"Q. Did you?

"A. No.

"Q. Did you lie to her?

"A. I would say yes.

"Q. Now, let's come to 1966 when you were in there talking to her and comparing your inventory with hers when she told you you were $6,000 short. Did you tell her that you must have left some sheets down at the office?

"A. Yes, to the same effect.

"Q. And did you tell her you'd go out and take a look and bring it back or did you call her on the phone?

"A. I would say something to that effect.

"Q. And did you?

"A. I would say yes.

"Q. Did you tell her in words or substance that you overlooked $6,000 worth of merchandise?

"A. I would again say yes.

"Q. Were you lying to her?

"A. Again, yes because this was the same system."

At the outset it becomes apparent that the resolution of claims such as here under consideration is difficult. Policies of the type in question are written to protect against *employee dishonesty,* and not inventory shrinkage which may result through bookkeeping error, shoplifting, larceny

by outsiders, or many other activities which are in no way related to a particular employee's peculations.

The concern of the insured is adequate coverage for the dishonesty of its employees. The insurance company, on the other hand, has a legitimate concern that without some type of a contractual limitation it can be made the guarantor of inventory losses no matter how loose the business practice involved.

In the interpretation of the subject clause, as yet to be decided by the Supreme Court of Ohio, a divergence of opinion has developed in other jurisdictions.

This divergence is well analyzed by Seymour Kurland in his article "Claims for Inventory Shortage Resulting from Employee Dishonesty Under Fidelity Insurance Bonds," July, 1966, Insurance Counsel Journal 397, at page 403:

"The few cases decided to date make it difficult to come to any firm conclusions as to exactly what will happen with the present standard exclusionary provision. And, even in these few cases, the courts have not been consistent in equating their interpretation of the provision with its application to the facts of the case at hand. Nevertheless, it seems safe at this point to try to glean from the cases what trends will be followed by the courts. A discernible pattern does seem to emerge.

"First, it is now clear, if it has not been in the past, that the inventory shortage claims that are based solely on a difference as revealed by company records, without more, will not be recoverable. It seems safe to say that this will be the case no matter how carefully the company's records are kept, and whether they are on a unit-count or dollar-value basis. There will have to be some evidence other than an extraordinary bookkeeping difference. However, it also seems clear that once there is other evidence, such as an employee confession, the exclusionary provision will not act as a complete prohibition of inventory determinations, whether they be labeled 'enumerations' or 'computations,' although records will be admissible, the extent of their admissibility will depend on the degree of their in-

herent trustworthiness, rather than on a literal reading of the policy provisions. * * *

"* * *

"On the whole, therefore, it seems that the desired purpose of the present exclusionary clause of keeping out of these cases all company records and computations from them will not be accomplished. But, was it realistic to expect that this could be accomplished in the first place? From a practical standpoint, if the policy was so construed, it is difficult to see how there could be any substantial recovery for inventory losses in any situation. Aside from company records, it is very rare that there would be any other evidence by which loss could be proven other than employee confessions."

We believe that the line of authorities permitting the finder of facts to consider inventory losses upon the establishment of independent evidence of employee dishonesty sets out the better rule. See *Hoboken Camera Center, Inc.*, v. *Hartford Accident & Indemnity Co.*, 93 N. J. Super. 484, 498, 226 A. 2d 439, 443; *Meyer Jewelry Co.* v. *General Ins. Co. of America* (Mo. 1968), 422 S. W. 2d 617; *Linden Motor Freight Co., Inc.*, v. *Travelers Ins. Co.*, 40 N. J. 511, 193 A. 2d 217.

In the *Hoboken Camera Center case*, the court, in adopting such view, said:

"We are satisfied, for the reasons already stated, that giving the inventory-exclusion clause its literal meaning in this case would be to nullify to a considerable extent the benefits fairly contemplated by the insured when it purchased the policy. On the other hand, we cannot say that insurers do not have a legitimate concern in attempting to protect themselves against claims which are built upon self-created inventory records. Such records, generally honestly and accurately kept by businessmen, are sometimes not deserving of the full measure of that description, and even if they are, will generally be inexact reflections of actual inventory shortages if computed on the basis of assumed average mark-ups or profit margins (see discussion *supra*). The reluctance of insurers to accept inventory

or profit and loss computations as proof of the fact or amount of losses alleged to result from dishonesty of employees is therefore understandable. See Kurland, *op. cit.*, *passim*. The judicial problem, therefore, is one of fair accommodation of the general right of an insurer to fix his undertaking, *cf. Linden Motor Freight Co., Inc.*, v. *Travelers Ins. Co.*, 40 N. J. 511, 525 (1963), and that of the general public, in buying insurance containing frozen, unbargained-for policy limitations, to get the degree of coverage it reasonably envisages.

"Such accommodation, in our judgment, should preclude recovery by the insureds under this bond if they had no proof whatever of an employee-connected loss other than inventory or profit and loss computations, no matter how reliable in the particular case. On the other hand, inventory records may by their very nature constitute inherently indispensable proof of an allowable claim under a fidelity bond in one or the other or both of two respects: (a) as the only available proof of the full amount of a loss, there being some appreciable proof from other facts or circumstances of a loss caused by employee-dishonesty; (b) as corroboration sufficient to make a case for the fact-finder of the fact of an employee-connected loss where independent proof thereof, considered alone, might be insubstantial. To deny an insured the right to adduce proof of inventory records for either of these purposes might in a particular case defeat justice by precluding recovery on a meritorious claim by use of the only proofs reasonably available to the insured and probative thereof. So to do would contravene public policy, not only in defeating the reasonable expectations of coverage of the purchaser of the insurance but also in allowing a private agreement to nullify the inherently probative effect of relevant evidence. *Cf. Garden State Plasa Corp.* v. *S. S. Kresge Co.*, *supra* (78 N. J. *Super.*, at *pp.* 500-503)."

We conclude that in an action on a fidelity insurance policy, where by its terms it does not apply to any loss "the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computa-

tion or a profit and loss computation," recovery should be precluded if the employer has no proof whatever of an employee-connected loss other than by inventory or profit-and-loss computation.

Further, we find in such an action based on loss due to employee dishonesty, that inventory computations or profit-and-loss computations of the employer can be considered by the trier of facts, when the alleged dishonesty has been established by evidence independent and apart from such computations.

In the instant case, where an employee admits that he fraudulently and falsely submitted inventory figures to his employer, which were grossly in excess of the actual physical inventory contemporaneously under his supervision and control, such admission is sufficient evidence of loss outside the employer's inventory computations or profit-and-loss computations to allow such computations to be considered by the jury in arriving at the actual loss sustained.

Assignments of error one through three are, therefore, overruled. We have examined the other assigned errors and find the same not to be well taken. The judgment of the trial court is, therefore, affirmed.

*Judgment affirmed.*

LYNCH, P. J., and O'NEILL, J., concur.